## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Colleen O'Connor,

                    Plaintiff,

                                              Civ. No. 06-4263 (RHK/JSM)
                                              **MEMORANDUM OPINION
                                              AND ORDER**

v.

Temple-Inland, Inc.,

                    Defendant.

---

Tammy P. Friederichs, Stephen M. Thompson, Friederichs & Thompson, PA,
Bloomington, Minnesota, for Plaintiff.

Ada W. Dolph, Beth G. Joffe, Seyfarth Shaw LLP, Chicago, Illinois, Joseph G. Schmitt,
Katie M. Connolly, Halleland Lewis Nilan & Johnson, PA, Minneapolis, Minnesota, for
Defendant.

---

## INTRODUCTION

Plaintiff Colleen O'Connor ("O'Connor") has sued her former employer, Temple-

Inland, Inc. ("Temple-Inland"), alleging that it discriminated against her due to her

gender, subjected her to a hostile work environment, and retaliated against her for

complaining about the purported discrimination.  Temple-Inland has moved for summary

judgment on all of O'Connor's claims.  For the reasons set forth below, the Court will

grant the Motion.

## BACKGROUND

### I.     The Parties

Temple-Inland is a Minnesota corporation that produces cardboard packaging at its plant in Shakopee, Minnesota.  (Jorgenson Dep. at 18.)  On August 15, 2005, Temple-Inland hired O'Connor as a general laborer.  (Pavek Dep. at 69.)  During her first week of employment, O'Connor received classroom training on general plant safety and employee orientation.  (O'Connor Dep. at 58.)  She initially began working as a Mini Press Operator, but ultimately agreed to work as a Roll Handler.  (Id. at 64-65.)

### II.    The Roll Handler Position

The main function of a Roll Handler is to bring rolls of paper to the Corrugator Machine ("Corrugator") via a clamp truck.[1]  (Id. at 265; Poppler Dep. at 12.)  New rolls and partially-used rolls ("stubs") are kept in the roll room until needed.  (O'Connor Dep. at 97-100.)  The Roll Handler uses the clamp truck to carry the appropriate roll to the Operator of the Corrugator ("Operator").  The Operator then takes the rolls from the staging area and puts them into the Corrugator.  (Poppler Dep. at 12; Rosentreter Dep. at 47.)

Once the Operator completes the processing of a roll of paper, the Operator removes the stub from the Corrugator, measures it, and writes the measurements on the original tag associated with that roll.  (Lehnen Dep. at 32; Rosentreter Dep. at 48.)  The Operator then enters the measurements on the computer, which generates a new tag of

---

[1] A clamp truck is a machine similar to a forklift.  (O'Connor Dep. at 65-66.)

measurements for that particular roll.  (David Thompson Dep. at 50; Lehnen Dep. at 32.)

The Roll Handler is responsible for retrieving the new tag, placing it on the stub, and

writing the size and paper grade on the stub with a marker.  (David Thompson Dep. at 49;

Lehnen Dep. at 32.)  This process is known as "marking" and "tagging" the roll.  (Dale

Thompson Dep. at 14; David Thompson Dep. at 37.)  The Roll Handler is also

responsible for using the clamp truck to remove the stub from the operating floor and

returning it to its proper storage position in the roll room.  (O'Connor Dep. at 66-68; Dale

Thompson Dep. at 24-26; Lehnen Dep. at 32-33; Poppler Dep. at 50.)

Each work shift at Temple-Inland has a schedule of "runs," which specifies when

the runs will begin and the type of paper (grade and length) to be used.  (O'Connor Dep.

at 161-63.)  Roll Handlers are expected to determine which rolls of paper are needed, and

when they are needed, by looking at the run schedule; Temple-Inland trains its employees

on how to print updated run schedules.  (Id. at 164-65; Poppler Dep. at 13.)  Other job

duties for Roll Handlers include sweeping the roll stockroom and unloading the rolls

from semi-trailers or rail cars and scanning them into inventory.  (O'Connor Dep. at 67-

69.)

In her position, O'Connor worked with Richard Poppler, who was often assigned

to assist her with her job duties, and with Mike Lehnen and David Thompson, who were

the first-shift Operators.  (Lehnen Dep. at 13; David Thompson Dep. at 9; Poppler Dep.

at 6-7.)  Her direct supervisor was Jeff Jorgenson, Shift Supervisor for the Corrugator

Department.  (Jorgenson Dep. at 12.)  Jorgenson reported to Daryl Worm, Plant

Superintendent.  (Worm Dep. at 17.)  Worm reported to Pete Pavek, Production Manager,

and Pavek reported to Jon Zimmer, General Manager.  (Pavek Dep. at 11, 13; Zimmer Dep. at 5, 10.)

### III.   Temple-Inland's Corporate Policy

Temple-Inland maintains a policy of "Equal Employment Opportunity for all people irrespective of race, color, age, sex, religion, or national origin" and prohibits behavior in the workplace that is "discriminatory or harassing."  (Def.'s Ex. B.)  The policy sets forth complaint-reporting procedures and prohibits retaliation.  (Id.)  During orientation, O'Connor received a copy of the employee handbook containing this policy.  (O'Connor Dep. at 58-59; Def.'s Ex. B.)

### IV.   Probationary Period

As with all new employees, O'Connor began her employment at Temple-Inland with a 50 working-day probationary period.[2]  (O'Connor Dep. at 58-60; Pavek Ex. 24; Simek Dep. at 33.)  O'Connor understood that the purpose of a probationary period was to provide her with training and assess her job performance.  (O'Connor Dep. at 58-60; Pl.'s Ex. 3.)  During the probationary period, supervisors provide an employee with written performance evaluations, called Weekly Progress Reports.  (Pavek Dep. at 29-30; Jorgenson Dep. at 15-16.)  "Probationary employees must reach *a minimum weekly score of 50* during their probationary period to be retained as a permanent employee."  (Pl.'s Ex. 26 (emphasis added).)

---

[2] This period is 50 actual working days when the employee is "present at the plant."  (Simek Dep. at 33-34.)

**V.      O'Connor's Training as a Roll Handler and Her Complaints to Management**

On August 19, 2005, O'Connor observed what the clamp-truck operator did, how the Corrugator operated, and how the roll room was organized.  (O'Connor Dep. at 82-83.)  On August 22, 2005, Temple-Inland provided O'Connor with a manual and training book for the Roll Handler position.  (Id. at 84-85.)   She also attended a classroom course on clamp-truck safety, which included a clamp-truck training video.  (Id.)

From August 26, 2005 to September 1, 2005, O'Connor practiced (1) driving the clamp truck and working its controls and (2) picking up, setting down, and maneuvering rolls with the clamp truck.  (Id. at 89-91, 93-95.)  O'Connor also learned how to unload the rolls from the semis and rail cars.  (Id. at 94-95.)

On September 2, 2005, O'Connor spent three hours making a diagram of the roll room and spent the rest of the day practicing on the clamp truck and unloading cars. (Pl.'s Ex. 16 at 2.)  On September 6, 2005, O'Connor unloaded semis; the following day she spent the morning unloading rails cars and the afternoon unloading semis.  (Id.)  On September 8, 2005, O'Connor received training from Poppler in retrieving the required rolls and returning partial rolls.  (Id.)  In the afternoon, O'Connor performed the Roll Handler position on her own for the first time.  (Id.; O'Connor Dep. at 109-10.)

On September 9, 2005, O'Connor was instructed to perform the Roll Handler position alone, but she was unable to keep up and reported to Jorgenson that she felt undertrained.  (Id.)   Jorgenson assigned Poppler to assist, but O'Connor felt that Poppler did not sufficiently answer her questions.  (Id.)  Nonetheless, O'Connor indicated that Poppler did explain how the clamp-truck operators set up the roll on the floor for a run,

and showed her a good place to put the stubs that needed to be returned.  (Id.)  Later that

day, Jorgenson helped O'Connor with moving the rolls to the Corrugators.  (Id.)  She felt

that Jorgenson "was very adequate in answering [her] questions."  (Id.)  O'Connor

received a performance rating of 31 and Jorgenson noted that she "needs to get time on

[the] clamp [truck] to familiarize herself with [the] controls[,] needs to learn roll room

layout[,] [and] ask questions of [the] crew if she d[id] not understand what to do

next . . . ."  (Pl.'s Ex. 15.)

On September 12, 2005, Poppler again assisted O'Connor in performing the Roll

Handler job; she testified that Poppler told her that she would never learn to keep up.  (Id.

at 3.)  The next day, she was asked to perform the Roll Handler job by herself, but she

was unable to keep up.  (Id.; O'Connor Dep. at 127.)  The Operators became frustrated

with her performance, caused in part because she had damaged four rolls and slowed

production.  (Id.)  O'Connor went to Nancy Simonson, Human Resources Manager, and

asked for the same training that a probationary Roll Handler on the third shift had

received, which was one week of training from Dale Thompson, who is the second shift

Roll Handler.  (O'Connor Dep. at 128-31.)  O'Connor also told Simonson that she felt

that she was being set up for failure.  (Id. at 131.)  At the end of her shift, O'Connor

talked to Dale Thompson about her frustrations in not receiving enough training for her

position.  (Id. at 142; Pl.'s Ex. 16. at 4.)  O'Connor asserts that Dale Thompson told her

that a woman had never worked as a Roll Handler and that her coworkers were likely

trying to push her out.  (Pl.'s Ex. 16 at 4.)  O'Connor also claims that Dale Thompson told her "in a very kind way" that this was not a job for a woman.[3]  (Id.)

O'Connor did not go to work on September 14, 2005, because she was unable to sleep the night before.  (O'Connor Dep. at 167-68.)  From home, she called Zimmer, the General Manager, and complained (1) about her lack of training and the comments that Dale Thompson had made to her (id. at 140-41, 254); (2) that her coworkers would yell at her and it was difficult to hear their answers, which were often incomplete (Zimmer Dep. at 26-27); (3) about the fast pace at which the Corrugator ran (id. at 27), and (4) that it was hard for her to keep up.[4]  (Id. at 25.)  Zimmer told O'Connor that the Corrugator area is a loud and fast environment, which might explain why she perceived someone was yelling at her.[5]  (Id. at 28.)  He said that he would speak with Jorgenson about providing her with additional training and with the other crewmembers regarding their communications with her.  (Id.)

On September 15, 2005, Simonson and Zimmer met with O'Connor to address her concerns.  (O'Connor Dep. at 92, 129, 167-68.)  Simonson told her that what Dale

---

[3] Dale Thompson testified that he did not remember talking with O'Connor.  (Dale Thompson Dep. at 18-19.)

[4] O'Connor also sent Zimmer an e-mail concerning her clamp-truck training and documentation of her interactions at work.  (O'Connor Dep. at 92, 117-19; Pl.'s Ex. 17.)  She continued to keep a detailed journal, in which she recorded all of her interactions at work with her coworkers and entered the notes in her journal at the end of the day.  (Id. at 119-21.)  She spent anywhere from five minutes to several hours completing each journal entry.  (Id. at 123.)

[5] The Corrugator generates noise at a level of approximately 105 decibels, the equivalent of a jackhammer.  (Zimmer Dep. at 28; O'Connor Dep. at 123-24; Poppler Dep. at 46; Def.'s Mem. at 6, n.5.)  Every employee is required to wear earplugs on the plant floor to protect their ears from the noise of the machine.  (O'Connor Dep. at 123-24.)

Thompson allegedly said was not the opinion of management and that they felt a woman could succeed and expected her to succeed in her position.  (Simonson Dep. at 16.) O'Connor told them that she felt she was being pushed too fast and that she had not received sufficient training to perform her position.  (Pl.'s Ex. 18.)

The following day, Jorgenson apologized to O'Connor about the misunderstanding with her training.  O'Connor claims that Jorgenson only spent five minutes with her when she thought he was going to spend one hour a day with her so that she could ask questions.  (O'Connor Dep. at 169.)  Jorgenson gave her a list of tasks to complete, a drawing of roll stock and the correct way to mark them.  (Pl.'s Ex. 18.)  Poppler assisted O'Connor the rest of the day.  (O'Connor Dep. at 172.)  On September 19, 2005, Jorgenson met with O'Connor for about five minutes; he drew her a diagram explaining the "feed sheet," which she found to be helpful.  (Pl.'s Ex. 18.)  Poppler assisted O'Connor the rest of the day.  (O'Connor Dep. at 172.)

During the ensuing two weeks, Poppler helped O'Connor with her job duties and the Operators assisted by marking rolls for her.  (O'Connor Dep. at 147-49, 178-79, 199.) For these two weeks, Jorgenson rated O'Connor 39 and 38 and noted that she was "still a little shaky on the clamp truck," needed to "work on [her] speed," was confused, and did not know when the crew was done with a run.  (Pl.'s Ex. 23-24.)

On September 29, 2005, O'Connor worked the Roll Handler position by herself because Poppler was needed elsewhere in the plant.  (O'Connor Dep. at 179; Pl.'s Ex. 18 at 2-3.)  She became frustrated with the increased workload and the Operators expressed their frustration about her performance, especially her failure to tag and put away all of

the stub rolls.  (Pl.'s Ex. 18 at 3; O'Connor Dep. at 180.)  For the week of September 26 to September 30, O'Connor received a performance rating of 42, which included a notation that she had "very few problems loading and unloading the corrugator by herself, [but she] [s]till has to work on speed and work on getting all stub rolls tagged and put away [and] [s]till doesn't understand end of run and what is running . . . ."  (Pl.'s Ex. 25.)

From September 30 forward, O'Connor began working the Roll Handler position alone.  (Pl.'s Ex. 18 at 3-7.)   During this time period, she asserts that on several occasions, Lehnen and David Thompson, the first-shift Operators, would purposely slow down production by telling her they no longer needed a certain roll and then later request that she go back and get the roll she had previously brought to them.  (O'Connor Dep. at 237-41.)  She also claims that on one occasion, she laid a roll in the staging area, facing the correct way, but that Lehnen and Thompson turned it the wrong way when she was on break.  (Id. at 229-30.)   On another occasion, she lined up the rolls that were needed for the upcoming run, but claims Lehnen and Thompson removed one of the rolls while she was on break and told her to go get it again.  (Id. at 230-32.)

On October 11, 2005, O'Connor and Poppler were involved in an accident while driving their clamp trucks, causing the chain on O'Connor's clamp truck to be ripped off.[6]  (Id. at 209-12.)  O'Connor believes that Poppler intentionally caused the accident.

---

[6] Neither O'Connor nor Poppler reported the incident to management on that day (which violated Temple-Inland's policy) and neither was disciplined for it.  (Simonson Dep. at 51, 70.) O'Connor, however, reported the accident the next day to both Chris Rosentreter (the supervisor filling in for Jorgenson) and Worm.  (O'Connor Dep. at 202-03; Pl.'s Ex. 28.)

(Def.'s Ex. W.)  On October 12, 2005, O'Connor asserts that Lehnen (1) yelled at her about a "run out" situation (id. at 199-200); (2) aggressively grabbed labels out of her hand (Pl.'s Ex. 18 at 6; O'Connor Dep. at 277-78); and (3) gestured at her with his staple gun after she had mistakenly thought he was holding her staple gun, and yelled, "What? You think I would steal your staple gun.  I don't need to steal."  (Pl.'s Ex. 18 at 6.)

Chris Rosentreter supervised O'Connor from October 5 to October 15 when Jorgenson was on vacation and out sick.  (O'Connor Dep. at 201, Jorgenson Dep. at 22-24; Rosentreter Dep. at 10-11.)  He observed that O'Connor (1) never unloaded the semi-trailers and rail-cars that came in with new paper stock; (2) on numerous occasions, drove her clamp truck in and out of the Corrugator area without carrying a roll; and (3) failed to mark and tag the stubs.  (Rosentreter Dep. at 23, 25-28.)  Rosentreter did not prepare a Weekly Progress Report, but did report these observations to Jorgenson.  (Jorgenson Dep. at 87; Rosentreter Dep. at 10-11, 23.)  Jorgenson indicated that Rosentreter told him that O'Connor "didn't have a clue," "was confused," and "was making mistakes."  (Jorgenson Dep. at 87.)

O'Connor informed Rosentreter on the evening of October 12, 2005, that she would not return to work because of the hostile work environment and her lack of training.  (O'Connor Dep. at 215-16; Pl.'s Ex. 18 at 7.)  On October 13, 2005, she called Zimmer and reported that the work environment was hostile and had escalated to the point where she no longer felt safe.  (Pl.'s Ex. 18 at 7.)  The next day, Zimmer, Pavek, Simonson, and Tom Simek (union president) met with O'Connor to address her concerns.

At the meeting, O'Connor reiterated her previous complaints about the hostile work environment and her lack of training.  (Simonson Dep. at 18; Pl.'s Ex. 18 at 7.)

Following the meeting, Zimmer, Simonson, Pavek, and Simek met with Poppler to question him about the clamp-truck incident.  (Zimmer Dep. at 43-45.)  Poppler told Zimmer that he did not intend to hit O'Connor's clamp truck, but was trying to "squeak through" and accidentally ripped off the chain on O'Connor's clamp truck with his wheels.  (Id. at 45, 50, 55.)  Although Zimmer concluded that Poppler did not intend to hit O'Connor's clamp truck, he did remind him of Temple-Inland's harassment-free workplace policy and that he must follow plant rules and regulations.  (Id. at 44-47, 54; Poppler Dep. at. 32-33.)

## VI.   O'Connor's Termination

On October 18, 2005, Simonson, Zimmer, Pavek, Worm, and Kent Kimmell (Regional Human Resources) discussed O'Connor's performance and status as a probationary employee.  (Simonson Dep. at 27-32.)  They decided to terminate O'Connor's employment because of her poor performance and inability to perform all of the functions of a Roll Handler.  (Id. at 31-32.)

On October 19, 2005, Simonson asked Jorgenson and Worm to notify O'Connor of her termination, which they did.  (Id. at 32; Jorgenson Dep. at 90; O'Connor Dep. at 283-84.)  The stated reason for her termination was job performance during her probationary period.  (Id. at 31; Def.'s Ex. N.)

On January 6, 2006, O'Connor filed a charge of gender discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC").  She

received a right-to-sue letter from the EEOC on September 21, 2006.  On October 23, 2006, O'Connor commenced the instant action.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## ANALYSIS

In her Complaint, O'Connor asserts claims for gender discrimination and harassment (Count I) and retaliation (Count II) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et. seq.* ("Title VII").  Neither claim withstands scrutiny.

I.      **Gender Harassment**[7]

Because O'Connor offers only indirect evidence of discrimination, the Court must apply the McDonnell Douglas burden-shifting framework when analyzing her employment discrimination claims.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-04 (1973).  Under McDonnell Douglas, O'Connor must first establish a prima facie case of gender harassment.  To do so, she must show that (1) she belonged to a protected group; (2) Temple-Inland subjected her to unwelcome harassment; (3) the harassment was based upon gender; (4) the harassment was sufficiently "hostile" to affect a term, condition, or privilege of her employment, and (5) Temple-Inland knew or should have known of the harassment and failed to take remedial action.  Turner v. Gonzales, 421 F.3d 688, 695 (8th Cir. 2005).  If O'Connor establishes a prima facie case, the burden of production then shifts to Temple-Inland to proffer a legitimate, nondiscriminatory reason for its action.  If it does, the burden then shifts back to O'Connor to demonstrate that Temple-Inland's stated reason is a pretext for discrimination ("a cover" for a discriminatory reason).  Nonetheless, O'Connor has the ultimate burden of persuading the trier of fact that Temple-Inland intentionally discriminated against her.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) ("the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all time with the plaintiff.").

---

[7] The Court notes that O'Connor appears to allege gender discrimination and harassment as two separate claims in her Complaint.  In her response memorandum, however, she only argues that Temple-Inland subjected her to harassment based upon her gender, which created a hostile work environment.  Therefore, the Court will analyze her claim as one for gender harassment.

Temple-Inland's position is that O'Connor's allegation of one isolated comment by Dale Thompson -- that the Roll Handler position was not a job for a woman -- is insufficient to establish a hostile work environment. (Def.'s Mem. at 33.)  It also argues that O'Connor's other complaints of workplace conduct are frivolous and do not constitute workplace harassment, and even if they did, there is nothing to suggest that such actions were directed at O'Connor because she is a woman. (Id. at 34.)

In the Court's view, even if O'Connor were able to prove that the alleged harassment had been based upon her gender, it did not rise to a level sufficient to fulfill the fourth element of a hostile-work-environment claim.[8]  "Hostile work environment claims are limited in nature, requiring a high evidentiary showing that the plaintiff's workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Vajdl v. Mesabi Acad. of KidsPeace, Inc., 484 F.3d 546, 550 (8th Cir. 2007) (internal quotation omitted).  For harassment to affect a term, condition, or privilege of employment, it "must be both subjectively offensive to the employee and objectively offensive such that a reasonable person would consider it to be hostile or abusive."  Williams v. Missouri Dep't of Mental Health, 407 F.3d 972, 975 (8th Cir. 2005) (internal citations omitted).

_____

[8] O'Connor also fails to establish the fifth element of her prima facie case because Temple-Inland took prompt remedial action.  The record shows that Temple-Inland provided her with additional training when she complained about her lack of training, conducted investigations regarding her complaints of harassment, and assured her that Dale Thompson's comments were not the opinion of management. (See Zimmer Dep. at 28, 45, 50, 53, 55; Simonson Dep. at 16.)

Here, O'Connor points to what she characterizes as a pattern of harassing behavior. (Pl.'s Opp'n Mem. at 44-47.) In particular, she points to (1) Dale Thompson's comments that Temple-Inland was trying to push her out because it never had a woman in the Roll Handler position and that this position was not a job for a woman; and (2) Poppler's comment that she was never going to learn the job. (Id. at 43-44.) O'Connor also asserts that the Operators purposely slowed down production on several occasions and that on one occasion Lehnen: (1) screamed at her, (2) allegedly grabbed papers out of her hand, and (3) pointed his staple gun at her after she mistakenly thought he had taken her staple gun. Finally, O'Connor asserts that Poppler intentionally hit her clamp truck. (Id. at 44-45.)

Viewing the record in the light most favorable to O'Connor, no reasonable person would consider the alleged harassment to be hostile or abusive. Williams, 407 F.3d at 975. Indeed, "[a]llegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was 'so intimidating, offensive, or hostile that it poisoned the work environment.'" Carpenter v. Con-Way Cent. Express, Inc., 481 F.3d 611, 618 (8th Cir. 2007) (citations omitted). First, the isolated comments made by Dale Thompson and Poppler do not "poison the work environment" and are not sufficient to be actionable. See Elmahdi v. Marriott Hotel Servs., Inc., 339 F.3d 645, 653 (8th Cir. 2003) (occasional "boy," "black boy" and other racial comments not sufficient); see also Carpenter, 481 F.3d at 618 ("To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant."). Moreover, O'Connor indicated that Dale Thompson made his comments "in a very kind way," and Simonson

told O'Connor that what Dale Thompson said was not the opinion of management and that they expected her to succeed in her position.  (Pl.'s Ex. 15; Simonson Dep. at 16.)

Furthermore, O'Connor's other complaints of alleged harassment were short-lived and infrequent; the complaints appear to be the type of isolated incidents, teasing, and offhand comments which, while offensive, do not reach the level of harassment.  See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.") (internal quotations omitted)).  The United States Supreme Court "has made it abundantly clear that the standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'"  Al-Zubaidy v. TEK Indus., Inc., 406 F.3d 1030, 1038 (8th Cir. 2005) (citing Faragher, 524 U.S. at 778).  In particular, Lehnen's alleged behavior, though undeniably rude, was not so severe that a reasonable person would find that the terms or conditions of her work environment had been altered.[9]  Accordingly, the behavior alleged by O'Connor is insufficient to state a prima facie showing that her workplace was "permeated with discriminatory intimidation, ridicule, and insult." Duncan v. Gen. Motors Corp., 300 F.3d 928, 934 (8th Cir. 2002) (citation omitted).

---

[9] The Eighth Circuit cases upholding hostile-work-environment liability have invariably involved far more hostile or abusive circumstances than presented here.  See, e.g., Delph v. Dr. Pepper Bottling Co. of Paragould, Inc., 130 F.3d 349, 352 (8th Cir. 1997) (intimidation plus "a steady barrage of racial name-calling"); Hathaway v. Runyon, 132 F.3d 1214, 1222 (8th Cir. 1997) (physical sexual advances followed by eight months of intimidating snickers); Ways v. City of Lincoln, 871 F.2d 750, 755 (8th Cir. 1989) (evidence included fifty examples of racial harassment); Hall v. Gus Constr. Co., 842 F.2d 1010, 1012 (8th Cir. 1988) (persistent verbal abuse and offensive physical touching); Gilbert v. City of Little Rock, 722 F.2d 1390, 1394 (8th Cir. 1983) ("more than a few isolated incidents of harassment must have occurred").

II.     **Retaliation**

O'Connor next claims that Temple-Inland retaliated against her after she reported claims of gender harassment.  To establish a prima facie case of retaliation, O'Connor must show that (1) she participated in a protected activity, (2) that Temple-Inland took adverse employment action against her, and (3) that a causal connection exists between the two.  Haas v. Kelly Servs., Inc., 409 F.3d 1030, 1036-37 (8th Cir. 2005).  If O'Connor establishes a prima facie case, the burden of production then shifts to Temple-Inland to show a legitimate, nondiscriminatory reason for its action.  If it does so, O'Connor must then establish that the proffered nondiscriminatory reason was pretext.

Temple-Inland asserts that O'Connor has failed to establish the third element of her prima facie case of retaliation because she has not presented evidence of a causal link between her termination and her protected activity.  The Court need not opine on that issue, because even if O'Connor had established a prima facie case of retaliation, she cannot show that Temple-Inland's proffered reason for terminating her employment – her poor performance during her probationary period - was pretext.

In order to show pretext, O'Connor must present evidence that (1) creates a fact issue as to whether Temple-Inland's proffered reason is pretextual and (2) creates a reasonable inference that it acted in retaliation.  Logan v. Liberty Healthcare Corp., 416 F.3d 877, 880  (8th Cir. 2005).  In attempting to satisfy this burden, O'Connor attempts to show pretext by showing that Temple-Inland's proffered reason has no basis in fact, that Temple-Inland changed its explanation for why it fired her, and that it deviated from its policies.  Upon close scrutiny, however, her attempts fail.

O'Connor first argues that Temple-Inland's proffered reasons during the litigation were false.  (Pl.'s Opp'n Mem. at 35.)  In particular, she argues that Temple-Inland enhanced the stated reason of "poor job performance" to include: (1) her ability to safely migrate through the roll room and keep up with production, and (2) her failure to meet the minimum weekly score of 50 during her probationary period.  (Id.)  With respect to safety, O'Connor asserts that Jorgenson testified that safety was an aspect of the job she did well.  Id. at 40.  But, Jorgenson and Lehnen also testified that they observed O'Connor operating the clamp truck in an unsafe manner.  (Id. at 46; Lehnen Dep. at 22, 35-37.)  With respect to production, O'Connor asserts that she was able to keep up with production as evidenced by the fact that she was feeding the entire machine alone as of September 29, 2005.  (Pl.'s Opp'n Mem. at 35.)  The record, however, contradicts this assertion.  Indeed, O'Connor acknowledged that she struggled to keep up with the increased workload and the Operators had expressed their frustration with regards to her performance, especially her failure to tag and put away all the stub rolls.  (Pl.'s Ex. 18 at 3; O'Connor Dep. at 180.)   Furthermore, Jorgenson testified that O'Connor was not working quickly enough and her Progress Reports also indicated that she needed to work on her speed.  (Jorgenson Dep. at 46; Pl.'s Exs. 23-25.)

With respect to performance, O'Connor argues that Temple-Inland's decision to stop giving her Progress Reports on October 5th means that it had determined she was qualified for the position.  (Pl.'s Opp'n Mem. at 36-37.)  This argument is without merit. First, O'Connor did not receive Progress Reports after October 5th because her supervisor, Jorgenson, who prepared all of her other Progress Reports, was out sick and

on vacation from October 5th – 15th.  Rosentreter supervised O'Connor during this time

period and reported to Jorgenson that O'Connor "didn't have a clue," "was confused,"

and "was making mistakes."  (Jorgenson Dep. at 87.)  O'Connor's Progress Reports also

show that she could not perform all of the duties of the Roll Handler position because she

was still "shaky" on the clamp truck and did not always mark and tag the stubs.  (Pl.'s

Ex. 25.)  Moreover, her coworkers complained to Jorgenson that she was unable to

perform the Roll Handler job duties and were frustrated because she was hampering their

work.  (David Thompson Dep. at 25, 27, 30-31.)

O'Connor next argues that Temple-Inland changed its explanation for why it fired

her.  She claims that Jorgenson told her that she was fired because of her low production

that occurred earlier that day or for a period of time.[10]  (Pl.'s Opp'n Mem. at 32.)

Jorgenson, however, does not remember what he specifically told O'Connor when he

notified her of her termination.  (Jorgenson Dep. at 90.)  Nonetheless, the decision to

terminate O'Connor was made the day before by Simonson, Worm, Zimmer, Pavek, and

Kimmell.  (Simonson Dep. at 27-32.)  Jorgenson was simply asked by Simonson to

inform O'Connor that Temple-Inland had decided to terminate her employment.

Furthermore, O'Connor fails to show how the conflicting explanations suggest that her

termination was somehow motivated by retaliation.  Indeed, O'Connor does not dispute

---

[10] O'Connor argues that the Kiwi Production Reports, which document production downtime,
fail to show that she caused any significant downtime.  (Pl.'s Opp'n Mem. at 30, 33.)  Temple-
Inland, however, did not rely on these reports in making its decision to terminate O'Connor.
(Def.'s Reply Mem. at 3; Zimmer Dep. at 62.)  Furthermore, Jorgenson testified in his deposition
that he observed O'Connor cause production downtime, and on numerous occasions, Worm and
Pavek alerted him to the production issues caused by O'Connor.  (Jorgenson Dep. at 28-31.)

that the downtime occurred on that day, but merely asserts that Worm did not tell her about the new production run.  (O'Connor Dep. at 285-87.)  Yet, it is the responsibility of a Roll Handler to determine which rolls of paper are needed and when by looking at the run schedule.  (O'Connor Dep. at 164-65; Poppler Dep. at 13.)  Additionally, there is no dispute that O'Connor struggled to keep up with the increased workload and needed to work on her speed.  (Pl.'s Ex. 18 at 3, 25; O'Connor Dep. at 180; Jorgenson Dep. 28-31.)

O'Connor also argues that Temple-Inland's failure to investigate her complaints of gender harassment is evidence of pretext.  (Pl.'s Opp'n Mem. at 27.)  The record, however, belies her argument.  When O'Connor first complained about her lack of training and Dale Thompson's comments, the record clearly shows that Temple-Inland provided her with additional training and assured her that Dale Thompson's comments were not the opinion of management and that they expected her to succeed in her position.[11]  (Zimmer Dep. at 28; Simonson Dep. at 16.)  When O'Connor complained about the clamp-truck accident with Poppler and Lehnen's rude behavior towards her, the record shows that Temple-Inland conducted an investigation regarding the accident and spoke to both Poppler and Lehnen.  (Zimmer Dep. at 45, 50, 53, 55.)

O'Connor also asserts that Temple-Inland failed to follow its normal practices for terminating a probationary employee.  (Pl.'s Opp'n Mem. at 41.)  It is her position that a

---

[11] The record is unclear if Temple-Inland talked to Dale Thompson about his comments.  Even if Temple-Inland failed to conduct an investigation of this isolated incident, O'Connor has proffered no evidence that he was involved in the decision to terminate her.  See Ghane v. West, 148 F.3d 979, 982 (8th Cir. 1998) (comment insufficient to show pretext because "there is no evidence that the remark was either made by a decision maker or made in connection with the decisional process.").

supervisor is supposed to talk to a struggling employee before the company fires that individual. (Id.) O'Connor asserts that the last word she received from her supervisor was that she had very few problems and received a rating of 42.[12] (Id.) In some instances, an employer's failure to follow its internal policies can be evidence of pretext. See, e.g., Russell v. TG Mo. Corp., 340 F.3d 735, 746 (8th Cir. 2003). Here, however, O'Connor has failed to identify any particular policy or procedure that required Temple-Inland to talk to a struggling employee before terminating that individual. Furthermore, O'Connor fails to address the fact that she did not achieve the minimum required score of 50 in order to be retained as a permanent employee and that her Progress Reports documented several performance deficiencies.[13]

Finally, O'Connor asserts that Temple-Inland deviated from its practice by not providing her with Progress Reports for two weeks in October. (Pl.'s Opp'n Mem. at 42.) She argues that Temple-Inland essentially accelerated her probationary period by terminating her for not attaining a minimum score of 50 within that accelerated time period. (Id.) This argument misses the mark because it fails to address the fact that Jorgenson was not working during this time period. Moreover, Rosentreter spoke to O'Connor about her performance deficiencies and reported his observations to Jorgenson.

---

[12] O'Connor's assertion is contradicted by the Progress Report itself, which noted that she still had to work on speed and getting all of the stub rolls tagged and put away and that she still did not understand what is running and the end of run process. (Pl.'s Ex. 25.)

[13] The Court notes that Temple-Inland retained O'Connor almost through the end of her probationary period. Notably, between June 20, 2005, and November 1, 2005, Temple-Inland hired 33 new production employees (29 male and 4 female), and ultimately terminated 11 of the probationary employees (10 male and 1 female, O'Connor) for failing to successfully complete their probationary periods. (Simonson Aff. at ¶¶ 5-6.)

(Rosentreter Dep. at 22-23, 25-29; Jorgenson Dep. at 87.)  The fact that Rosentreter did

not provi de her with a Progress Report for those two weeks does not create a reasonable

inference that she was retaliated against.  Managers are expected to demonstrate a high

level of independence and initiative and although O'Connor may believe that Temple-

Inland should have provided her with a formal Progress Report, an employer's "failure to

inform an employee of what is expected of [her] is not evidence of discriminatory

animus."  Rose-Maston v. NME Hosps., Inc., 133 F.3d 1104, 1108 (8th Cir. 1998).

While O'Connor has questioned Temple-Inland's management style, she does not have a

viable Title VII claim.  See Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th

Cir. 1995) ("[T]he employment-discrimination laws have not vested in the federal courts

the authority to sit as super-personnel departments reviewing the wisdom or fairness of

the business judgments made by employers, except to the extent that those judgments

involve intentional discrimination.").  Accordingly, summary judgment for Temple-

Inland is warranted on O'Connor's retaliation claim.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**ORDERED** that Defendant Temple-Inland's Motion for Summary Judgment (Doc. No.

27) is **GRANTED** and Plaintiff Colleen O'Connor's Complaint (Doc. No. 1) is

**DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: January  7  , 2008                                    s/Richard H. Kyle
                                                             RICHARD H. KYLE
                                                             United States District Judge